UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE SHINNECOCK INDIAN NATION,  **MEMORANDUM**
 and **ORDER**
        Plaintiff,

  - against -  05-CV-2887 (TCP)

THE STATE OF NEW YORK et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
PLATT, District Judge

      Defendants move to dismiss this case under <u>inter alia</u> Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that the plaintiffs have failed to state a claim for relief.[1] Plaintiffs the Shinnecock Indian Nation ("Shinnecocks" or "Nation") bring this action to redress wrongs committed against them more than 140 years ago. The Nation seeks to vindicate its rights to certain lands located in the Town of Southampton in Suffolk County, New York. The lands at issue are a portion of those lands conveyed to the Nation by a lease for a term of 1,000 years executed in 1703 by the Trustees of the Commonality of the Town of Southampton, as

---

[1] Defendants the State of New York and Governor Pataki (the "State" defendants), defendant Long Island Railroad Company ("LIRR"), and each of the other defendants joining together ("Municipal and Private Defendants") filed motions to dismiss the Shinnecocks' Amended Complaint. LIRR and Municipal and Private Defendants sought dismissal under Rule 12(b)(6), and moved alternatively that the proceedings be stayed pending determination of plaintiffs' federal recognition petition by the Bureau of Indian Affairs pursuant to 25 C.F.R. Part 83. The State claimed immunity from suit, and also joined in the arguments advanced by the rest of the defendants under Rule 12(b)(6). LIRR additionally sought dismissal under FRCP Rule 19 in the event the State were dismissed as a party. This Court heard oral argument on the various motions to dismiss on September 29, 2006.

lessor (the "1703 Lease"). (Compl. at ¶ 1.)² The Nation claims that its rights to a substantial portion of the lands under the 1703 Lease were wrongfully conveyed and released in 1859 to the Trustees of the Proprietors of the Common and Undivided Lands and Marshes (or Meadows), in the Town of Southampton, in violation of the federal Indian Non-Intercourse Act ("NIA"). (Compl. at ¶¶ 1; 2). The Nation seeks broad relief that includes damages for each portion of the Subject Lands acquired or transferred from the Nation for the period from 1859 to present, a declaration that the Nation has possessory rights to the Subject Lands, immediate ejectment of all defendants from the lands, and other declaratory and injunctive relief as necessary to restore the Nation to possession of the lands. (Compl. at 20-23)

The claims the Nation brings and the nature of relief sought pose the same type of "pragmatic concerns" that guided the Supreme Court and Second Circuit recently to deny relief in City of Sherrill v. Oneida Indian Nation, 544 U.S. 197 (U.S. 2005), and Cayuga Indian Nation of New York v. Pataki, 413 F.3d 266 (2d Cir. 2005). These concerns permeate here and warrant dismissal based on equitable considerations, including laches³.

**BACKGROUND**

Plaintiffs the Shinnecock Indian Nation describe themselves as "the guardians and residents of the area now encompassed by the Town of Southampton", a "whaling, gathering,

---

²Unless otherwise indicated, all references to Complaint or "Compl." are to the First Amended Complaint, dated August 5, 2005.

³Defendants make a number of arguments in their Motions to Dismiss the Complaint, including laches. Because the Court finds that the plaintiffs' claims are barred by laches, it will not address the rest of the defendants' arguments.

hunting and fishing, and wampum-making people of the Eastern Woodlands Algonquin."
(Compl. at ¶ 1.) For more than 300 years, the State of New York and the Town of Southampton
have acknowledged the Shinnecocks as a nation or Tribe of Indians. (Compl. at ¶ 9.) The lands
at issue involve thousands of acres of land located in the Town of Southampton in Suffolk
County in the State of New York, and are referred to as follows:

> . . . ALL that certain Tract of land & premises commonly known
> as "Shinnecock Hills" and "Sebonac Neck" including Ram Island,
> situated in said Town of Southampton, County of Suffolk & lying
> North of a certain line commencing at the head of the Creek and
> running along the Indian Ditch where the fence now stands to the
> Stephen Post Meadow so called, thence along the old Ditch on the
> South side of said meadow to Old Fort Pond where the water fence
> formerly stood with all & singular the hereditaments &
> appurtenances to the same belonging or in anywise appertaining.

(Compl. at ¶ 7.) The Shinnecock Canal is the approximate location of the westward boundary of
the Subject Lands. (Compl. at ¶ 8.) The eastward boundary of the Subject Lands runs
approximately from the head of Heady Creek at the intersection of East Gate Road and the
Montauk Highway, at its southern end, to Bullhead Bay, at its northern end, all within the
boundaries of the Town of Southampton. (Compl. at ¶ 8.)

The Nation asserts that in 1703, it entered into a lease with the Trustees of the
Freeholders and that the Lease recognized and confirmed the Nation's rights to the Subject Lands
for 1000 years, meaning in perpetuity. (Compl. at ¶ 27.) The Nation alleges that on or about
April 21, 1859, in violation of the federal NIA[4], the Trustees of the Proprietors, with

---

[4]The 1834 version of the NIA was in effect at the time of the 1859 Taking, and remains in effect today. It provides that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177.

authorization from the State of New York, entered into an "indenture" with the Trustees of the Nation, under which the right, title and interest of the Nation to the Subject Lands was conveyed to the Trustees of the Proprietors. (Compl. at ¶ 31; 34)

The defendants have claimed rights to, and continue to claim rights to, portions of the Subject Lands. (Compl. at ¶ 40.) These defendants are: The State of New York; George E. Pataki in his individual capacity and as Governor of the State of New York; County of Suffolk, New York; Town of Southampton, New York; Trustees of the Proprietors of the Common and Undivided Lands of the Town of Southampton a/k/a Trustees of The Proprietors of the Common and Undivided Lands and Marshes (or Meadows), in the Town of Southampton; Trustees of the Freeholders and Commonality of the Town of Southampton a/k/a Trustees of the Commonality of the Town of Southampton; Shinnecock Hills Golf Club; National Golf Links of America; Parrish Pond Associates, LLC; Parrish Pond Construction Corp.; PP Development Associates, LLC; Sebonac Neck Property, LLC; Southampton Golf Club Incorporated; 409 Montauk, LLC; Southampton Meadows Construction Corp.; Long Island Railroad Company; and Long Island University.

Against all defendants, the Shinnecocks assert a claim for violation of the NIA, and claims for trespass and waste. The Shinnecocks specifically seek the following relief from all defendants, except the Long Island Railroad Company and the Long Island University.[5]

---

[5]It is not clear whether plaintiffs' failure to request the same specific relief from The Long Island Railroad Company and the Long Island University is inadvertent error. Assuming it is not, plaintiffs' lack of request for specific relief from these defendants does not alter this Court's holding with respect to the character of plaintiffs' claims, since plaintiffs specifically charge these defendants with violations of the NIA, and trespass and waste. Furthermore, plaintiffs' request to the Court for a declaration that plaintiffs have possessory rights to the Subject Lands, if granted, would be a carte blanche for plaintiffs to later seek ejectment of these defendants.

(1)    damages for each portion of the Subject Lands acquired and/or transferred from the Nation or occupied by the various defendants for the period from 1859 to the present time, including prejudgment interest, thereon, including (a) the fair market value of, and damages for the unlawful possession of the Subject Lands; (b) lost profits; (c) consequential damages; and (d) the amount by which the value of the Subject Lands was diminished by any extraction of resources, damage, pollution or destruction, including damage and destruction of the Nation's burial grounds and cultural sites;

(2)    interest, including prejudgment interest, on damage caused by the various defendants, and attorneys' fees and costs of this action;

(3)    a declaration that (a) the Shinnecock Indian Nation has possessory rights to the Subject Lands conferred by federal law, and that there has been no valid termination of those possessory rights; (b) the Subject Lands were conveyed unlawfully from the Nation in violation of federal law; (c) the 1859 Taking was void ab initio; (d) the Subject Lands have been in the unlawful possession of the defendants; (e) all interests of defendants in the Subject Lands are null and void; and (f) the defendants shall be immediately ejected from the Subject Lands;

(4)    declaratory and injunctive relief as necessary to restore the Nation to possession of those portions of the Subject Lands to which the defendants claim title.

Additionally, the Shinnecocks also seek from the Town of Southampton, the Trustees of the Proprietors and the Trustees of the Freeholders an accounting and disgorgement of the value of the benefits received by these defendants from each purported purchaser of the Nation's interest in the Subject Lands, including the value of the benefits received from the subsequent resale of the Subject Lands. (Compl. at 21)

## DISCUSSION

The Second Circuit in <u>Cayuga</u>, also in 2005, observed that the Supreme Court decision in <u>Sherill</u> "has dramatically altered the legal landscape against which we consider

plaintiffs' claims." Id. at 273. In Sherill, the Supreme Court found an Indian tribe's claim for sovereign control - although legally viable and within the statute of limitations - to be barred by the equitable defenses of laches[6], acquiescence and impossibility. Guided by the Supreme Court's broad language in Sherill, the Second Circuit applied the equitable defense of laches to plaintiffs' possessory land claim:

> ...the broadness of the Supreme Court's statements indicates to us that *Sherill*'s holding is not narrowly limited to claims identical to that brought by the Oneidas, seeking a revival of sovereignty, but rather, that these equitable defenses apply to "disruptive" Indian land claims more generally.

Id. at 274.

The Cayuga court found inherently disruptive and subject to a defense of laches plaintiffs' claim seeking possession of a large swath of central New York State and the ejectment of tens of thousands of landowners:

> Indeed, this disruptiveness is inherent in the claim itself-which asks this Court to overturn years of settled land ownership-rather than an element of any particular remedy which would flow from the possessory land claim. Accordingly, we conclude that possessory land claims of this type are subject to the equitable

---

[6] As the Supreme Court succinctly put it, "laches is not . . . a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced-an inequity founded upon some change in the condition or relations of the property or the parties." Sherill, 544 U.S. at 217-218, citing Galliher v. Cadwell, 145 U.S. 368, 373 (1892).

6

considerations discussed in *Sherrill*.

Id. at 275.

In barring the claim, the Second Circuit held that equitable defenses are not limited to actions at equity, and indicated that trial courts can apply these defenses at the pleadings stage:

> This conclusion is reinforced by the fact that the *Sherill* opinion does not limit application of these equitable defenses to claims seeking equitable relief.

Id.

. . .

> Whether characterized as an action at law or in equity, any remedy flowing from this possessory land claim, which would call into question title to over 60,000 acres of land in upstate New York, can only be understood as a remedy that would similarly "project redress into the present and future."

Id.

. . .

> To summarize: the import of *Sherill* is that "disruptive," forward-looking claims, a category exemplified by possessory land claims, are subject to equitable defenses, including laches. Insofar as the Cayugas' claim in the instant case is unquestionably a possessory land claim, it is subject to laches. The District Court

found that laches barred the possessory land claim, and the considerations identified by the Supreme Court in *Sherill* mandate that we affirm the District Court's finding that the possessory land claim is barred by laches. The fact that, nineteen years into the case, at the damages stage, the District Court substituted a monetary remedy for plaintiffs' preferred remedy of ejectment cannot salvage the claim, which was subject to dismissal *ab initio*. To frame this point in a different way: if the Cayugas filed this complaint today, exactly as worded, a District Court would be required to find the claim subject to the defense of laches under *Sherill* and could dismiss on that basis.

Id. at 277-78.

In addition to dismissing the Cayuga's claim for ejectment, the court also dismissed the Cayuga's remaining claims, including requests for a declaration of title to the land and for damages based on a trespass claim. The court dismissed these claims as they were "predicated entirely upon plaintiffs' possessory land claim," which was barred by laches. Id. at 278.

In sum, Cayuga unveiled three principles, each of which apply with equal force here: (i) equitable defenses apply to disruptive Indian land claims, such as possessory land claims, and are not limited to claims seeking a revival of sovereignty, (ii) equitable defenses apply to both actions at law and in equity, because the focus is on the potentially disruptive nature of the claim, and (iii) equitable defenses can be applied at the pleadings stage to dismiss

8

disruptive possessory land claims.

In ruling on defendants' motions to dismiss, we are guided by the principles established in <u>Sherill</u> and <u>Cayuga</u>. The Court finds that the claim the Nation asserts here is exactly the type of claim that the <u>Cayuga</u> court found barred by laches: a forward looking, possessory land claim, that seeks to "project redress . . . into the present and future"[7]:

> The nature of the claim as a "possessory claim,"
> as characterized by the District Court, underscores
> our decision to treat this claim like the tribal sovereignty
> claims in *Sherill*.

<u>Cayuga</u>, 413 F.3d at 275.

. . .

> Indeed, this disruptiveness is inherent in the claim
> itself-which asks this Court to overturn years of settled
> land ownership-.... Accordingly, we conclude that possessory
> land claims of this type are subject to the equitable
> considerations discussed in *Sherill*.

<u>Id</u>.

. . .

> These considerations include the following:
> "[g]enerations have passed during which non-Indians
> have owned and developed the area that once composed

---

[7]<u>Cayuga</u>, 413 F.3d at 275, citing <u>Sherill</u>, 125 S.Ct. at 1494 n.14.

9

> the Tribe's historic reservation,"... "at least since the middle years of the 19th century, most of the [Tribe] have resided elsewhere,"..."the longstanding, distinctly non-Indian character of the area and its inhabitants," . . . "the distance from 1805 to the present day,"... "the [Tribe's] long delay in seeking equitable relief against New York or its local units,"...and "developments in [the area] spanning several generations."

Cayuga, 413 F.3d at 277, quoting Sherill, 125 S.Ct. at 1483, 1494.

Similar considerations are present here: the Shinnecocks have not occupied the Subject Lands since 1859; since 1859 the Lands have been the subject of occupation and development by non-Indians (according to the 2005 U.S. Census Bureau Fact Sheet, Suffolk County, N.Y., only .2% of Suffolk County residents are of American Indian descent); over 140 years passed between the alleged wrongful dispossession and the attempt to regain possession; and there has been a dramatic change in the demographics of the area and the character of the property.

Similarities also exist in the relief sought. For example, like the plaintiffs in Cayuga, the Shinnecocks seek, inter alia, a declaration of their possessory interest in the subject land, restoration to possession of the land and immediate ejectment of defendants from the subject land, damages equal to the fair market value of the land for the entire period of plaintiffs' dispossession, as well as an accounting and disgorgement of all benefits received by the defendant municipalities, such as tax revenue.

10

The Nation points to several reasons - none of which the Court finds persuasive - why laches should not apply here. First, the Nation asserts that it has not slept on its rights, but it has objected to the 1859 Taking in the very year it occurred, and that institutional barriers prevented the Nation from having a forum to subsequently vindicate its rights. (Compl. at ¶¶ 36, 44-45; Plaintiffs' Memorandum of Law in Opposition to Defendant Long Island Railroad Company's Motion to Dismiss at 3). We note that similar arguments did not preclude the Second Circuit in <u>Cayuga</u> from denying plaintiffs' request for relief. <u>Cayuga</u>, 413 F.3d at 279-80 (declaring not dispositive for the court's consideration of laches question findings that the Cayugas were not responsible for any delay in bringing the action and that the delay was not unreasonable insofar as the actions of the Cayugas were concerned).

Further, the Shinnecocks assert that their claim is not disruptive. In an attempt to distinguish <u>Cayuga</u>, the Shinnecocks point to the smaller number of owners they seek to eject and the small parcel of land involved.[8] Their attempt to distinguish <u>Cayuga</u> must fail, as the test for disruptiveness is not based on strict numeric calculations and is refuted by <u>Sherill</u>, where the claim involved a very small parcel of land. The Court finds disruptive Shinnecocks' claim that seeks the immediate ejectment of a number of defendants, including Sebonac Neck Property, LLC, 409 Montauk LLC, Southampton Golf Club Incorporated, National Golf Hills Links of America, Parrish Pond Construction Corp., and apparently the Long Island Railroad Company[9]

---

[8] In their Complaint, plaintiffs characterize the Subject Lands "at issue in this litigation [to] comprise thousands of acres of land." (Compl. at ¶ 7)

[9] The Court notes that ejecting the Long Island Railroad Company from the Subject Lands would have devastating consequences to the region's economy and a drastic impact on thousands of commuters. <u>Accord</u>, <u>Cayuga Indian Nation v. Cuomo</u>, 1999 WL 509442, at *29 (N.D.N.Y. 1999) ("...ejectment would mean that transportation systems, such as the New York State

11

and the Long Island University. Ejectment, given the drastically changed conditions in the subject lands over the past 140 years (as evidenced by the types of defendants being sued), is impractical and imposes disruptive consequences of the type that led the Supreme Court to initiate the impossibility doctrine. See, e.g., City of Sherill, 544 U.S. at 219-20 (applying the impossibility doctrine to a tribe's claim for sovereign control); Cayuga, 413 F.3d at 277 (discussing the impossibility doctrine in the context of a claim for ejectment).

Next, the Nation claims that the 1859 Taking was executed by fraudulent means and threats of intimidation. But even assuming, arguendo, the veracity of this statement, we do not reach a different conclusion. Equitable considerations bar plaintiffs' claims irrespective of their viability. See City of Sherill, 544 U.S. at 213-214 (observing the "sharp distinction between the *existence* of a federal common law right to Indian homelands and how to *vindicate* that right... .") (citations omitted).

Based on the foregoing, we find that plaintiffs' possessory land claim is subject to laches, and dismiss on that basis. Further, because the rest of plaintiffs' claims are "predicated entirely upon plaintiffs' possesory land claim", they are also dismissed. Cayuga, 413 F.3d at 278.

To be sure, the wrongs about which the Shinnecocks complain are grave, but they are also not of recent vintage, and the disruptive nature of the claims that seek to redress these wrongs tips the equity scale in favor of dismissal.

## CONCLUSION

---

Thruway, would have to be rerouted at great expense. Putting aside costs, rerouting the Thruway would have almost unthinkable consequences in terms of intrastate and interstate commerce.")

Accordingly, defendants' motions under Fed. R. Civ. P. 12(b)(6) must be and are hereby GRANTED.

/s/

Thomas C. Platt, U.S.D.J.

Dated: Central Islip, New York

November 28, 2006